Case 4:20-cr-00695   Document 1   Filed on 12/28/20 in TXSD   Page 1 of 9

United States Courts Southern
District of Texas
FILED

*December 28, 2020*

Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** § § | |
| v. § § | Criminal No. |
| **JOHN ED JAMES,** § § § | **4:20-cr-695** |
| **Defendant.** | |

## INFORMATION

THE UNITED STATES CHARGES:

### General Allegations

At all times material to this Information, unless otherwise specified:

### Relevant Market Background

1. Natural gas was an energy commodity that was traded by buyers and sellers who bought and sold natural gas through different types of commercial transactions.

2. One way to trade natural gas was to buy or sell a "futures contract." A futures contract was an agreement that obligated the contracting parties to buy or sell a product or financial instrument at a fixed quantity and price for delivery at a specific date and time in the future.

3. Futures contracts were traded on exchanges—designated commodities markets regulated by the United States Commodity Futures Trading Commission ("CFTC"), including the New York Mercantile Exchange, Inc. ("NYMEX") and the Chicago Mercantile Exchange ("CME"), which operated through servers located in or around Chicago and Aurora, Illinois, and ICE Futures U.S., Inc. ("ICE"), which operated through servers located in or around Chicago, Illinois. NYMEX, CME, and ICE each listed different products for trading, including natural gas

futures contracts, and determined and enforced rules and procedures for trading on their respective exchanges.

4. Natural gas traded at different prices at different physical delivery points throughout the United States. "Henry Hub"—the delivery location (or hub) near Louisiana's Gulf Coast that connected several intrastate and interstate pipelines—was used as the standard pricing reference for natural gas futures contracts. The price of natural gas was driven by supply and demand, which was impacted by various factors, including stored gas reserves and the weather.

5. The exchanges offered the opportunity to trade in Henry Hub futures contracts, which were priced based upon the price of natural gas at the Henry Hub delivery point during specified time periods.

6. A trader could place an order either to buy (a "bid") or to sell (an "offer") a certain quantity expressed in the number of contracts of a specific futures contract. An order was "filled" when a buyer's bid price and a seller's offer price matched for a particular futures contract. A trader who purchased a commodity established a "long" position; a trader who sold a commodity established a "short" position.

7. Offsetting trades were opposite transactions for an equal number of contracts of the same delivery month that liquidated a purchase or sale of futures contracts and "closed" a position. By offsetting a futures contract, a trader canceled any delivery obligation of the underlying commodity. The net gain or loss on the trade was equal to the difference between the price of the futures contract when the trade was initiated and the price when it was offset.

8. Futures contracts could be traded on exchanges directly through their electronic platforms or through a registered broker who served as an intermediary to match a willing buyer and seller. After matching a willing buyer and seller, a broker then submitted the executed trade

to an exchange for reporting and clearing. Brokers were prohibited from taking the other side of a customer's order absent written consent from the customer and compliance with exchange rules.

9. With limited exceptions, all purchases and sales of commodity futures must be executed openly and competitively. One exception to this requirement was for certain trades, such as block trades, that complied with specific requirements under the exchange rules. Block trades were permissible, privately negotiated transactions that met certain exchange-determined quantity thresholds and were reported to and entered on the exchange for price reporting and clearing. While block trades were not negotiated on the open market, under exchange rules, block trades were required to be executed at fair and reasonable prices, taking into account, among other factors, the circumstances and prices of the market.

10. Fictitious sales were prohibited trades that were not bona fide, arms-length transactions. Trades that negated market risk and competition, such as prearranged trades that were noncompetitive trades based on an express or implied agreement or understanding and predetermined terms, and accommodation trades that were noncompetitive trades intended to assist another person's illegal trades, were considered prohibited fictitious sales.

## Relevant Entities and Individuals

11. "Company A," located in Houston, Texas, was an energy company that engaged in, among other business, the trading of natural gas products in the United States. Company A was a customer of Brokerage Firm 1.

12. "Brokerage Firm 1" was a registered brokerage firm in Houston, Texas, that provided brokerage services in various energy markets in exchange for commission fees. Among the services Brokerage Firm 1 provided was to facilitate block trades in natural gas futures contracts between its customers and others in the market.

13. "Investment Company 1" was a company established by Person 1 for his personal investments and business.

14. "Trading Firm 1" was the trade name through which Investment Company 1 operated as a trading firm. Trading Firm 1 operated from the same physical office as Brokerage Firm 1 and employed only two traders.

15. "Trading Firm 2" was a company established by defendant **JOHN ED JAMES ("JAMES").**

16. Defendant **JAMES**, a resident of Katy, Texas, was a natural gas trader and the owner and sole principal of Trading Firm 2.

17. Marcus Schultz, a resident of Houston, Texas, was a natural gas trader at Company A.

18. "Person 1," a resident of Houston, Texas, was the owner, president, and a registered "associated person" of Brokerage Firm 1, meaning he solicited, received, and executed customer orders in exchange for commission fees. As owner and president, Person 1 supervised others at Brokerage Firm 1. Person 1 was also the sole member of Investment Company 1 and one of the traders for Trading Firm 1, which he used to trade for Person 1's own benefit. Pursuant to Brokerage Firm 1's brokerage agreement with Company A, exchange rules, and CFTC regulations, for nonpublic information acquired through the broker-customer relationship, Person 1 had a duty not to (1) disclose to unauthorized persons Company A's material, nonpublic information, or (2) use Company A's material, nonpublic information for his own benefit.

19. "Person 2" was an energy trader and used Person 1 to broker trades in natural gas futures contracts.

## COUNT ONE
### (18 U.S.C. § 371 – Conspiracy)

20. Paragraphs 1 through 19 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

21. Beginning in or around 2013 and continuing through at least in or around June 2016 the exact dates being unknown, in the Houston Division of the Southern District of Texas and elsewhere, the defendant

**JOHN ED JAMES**

knowingly and willfully, that is, with the intent to further the objects of the conspiracy, conspired and agreed with other individuals, known and unknown, to commit certain offenses against the United States, namely:

   a. to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud a person in connection with a commodity for future delivery in violation of Title 18, United States Code, Section 1348(a).

   b. to knowingly and intentionally devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

22. The purpose of the conspiracy was for **JAMES** and his co-conspirators to (a) enrich themselves from the profits derived from fraudulent and unlawful trading practices and

misappropriation of material, nonpublic information, and (b) conceal their fraudulent and unlawful activities from Company A, market participants, the exchanges, the CFTC, and law enforcement.

## Manner and Means of the Conspiracy

23. The manner and means by which **JAMES** and his co-conspirators sought to accomplish and did accomplish the purposes of the conspiracy included, but were not limited to, the following:

24. **JAMES,** Schultz, Person 1, Person 2, and others known and unknown, misappropriated Company A's material, non-public information and engaged in fraudulent, noncompetitive trades and prohibited fictitious sales, including prearranged trades, in natural gas futures contracts for their own personal gain. By entering into the fraudulent trades, **JAMES**, Schultz, Person 1, Person 2, and others caused prices to be reported, recorded, and registered that were not true, bona fide prices.

25. The fraudulent trades were reported to, entered on, and cleared through an exchange via interstate wire communications. These interstate wire communications originated from in or around Houston, Texas and were transmitted through ICE, NYMEX, or CME servers located in Illinois.

26. To execute the scheme, Schultz disclosed to **JAMES** and Person 1 Company A's material, nonpublic information, including identity, trade interests, terms, and conditions, such as prices, purchase or sale, quantity, volume, source, delivery points, timing, and thresholds or limits to the terms to which he would agree ("Inside Information") in violation of his duty of loyalty, trust, and confidentiality to Company A, knowing and intending that Inside Information would be misappropriated and used by **JAMES**, Person 1, and Person 2 to enter into prearranged trades to fill Schultz's orders and offsetting trades for their personal gain.

27. Person 1 misappropriated Inside Information in violation of his duty of loyalty, trust, and confidentiality to Company A to match Schultz's orders directly with prearranged counterparties, including **JAMES**, Person 1, and Person 2 instead of pursuing a competitive price in the market in an arms-length transaction.

28. **JAMES** misappropriated the Inside Information and entered into noncompetitive trades to fill Schultz's orders and offsetting transactions in the market at a profit for his personal gain.

29. Schultz's initial, prearranged bids or offers were based on the terms needed to accommodate and make a profit in the offsetting trades, rather than at arms-length, bona fide terms. The net profits from these fraudulent trades were split between **JAMES** and the individuals involved in the particular fraudulent trade.

30. **JAMES**, Schultz, Person 1, and Person 2 agreed to document certain proceeds through Form 1099-MISCs in part to conceal the true nature of the funds and make them appear to be legitimate income paid.

## Overt Acts

31. In furtherance of the conspiracy and to achieve the objects thereof, **JAMES** and his co-conspirators committed and caused to be committed the following overt acts, among others, in the Southern District of Texas, and elsewhere:

32. On or about January 8, 2015, **JAMES** caused Trading Firm 2 to sell 856 lots of JV DTI to Company A at $-1.3525.

33. On or about January 27, 2015, **JAMES** caused Trading Firm 2 to purchase 608 lots of XH TCO from Company A at $-0.2775.

34. On or about January 10, 2016, Schultz text messaged Person 1's wife, requesting a Form 1099-MISC: "When will you have 1099 this year. Just working throw [sic] stuff and was going to set up appt with tax guy." Person 1's wife responded: "I'm hoping to have them done by end of this week. As soon as I get this stupid phone system working, I can knock those out."

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
(18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c))

35. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the United States gives notice that upon the defendant's conviction of Count One of this Information, the United States will seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to the conspiracy.

36. The United States also gives notice that it will seek a money judgment against the defendant.

37. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exist, the United States will seek to forfeit any other property of the defendant up to the amount of the money judgment.

|  |  |
|---|---|
| Ryan K. Patrick<br>United States Attorney<br>Southern District of Texas | Daniel S. Kahn<br>Acting Chief, Fraud Section<br>Criminal Division<br>United States Department of Justice |
| By: *Suzanne Elmilady*<br>Suzanne Elmilady<br>Assistant United States Attorney<br>Southern District of Texas<br>SElmilady@usa.doj.gov<br>(713) 567-9342 | *Drew Bradylyons*<br>Drew Bradylyons<br>Della Sentilles<br>Trial Attorneys<br>Criminal Division, Fraud Section<br>drew.bradylyons@usdoj.gov<br>della.sentilles@usdoj.gov<br>(202) 262-7809 |